LAW OFFICES OF SAMUEL F. GALICI
Samuel F. Galici    (102496)
1190 S. Victoria Ave., Suite 204
Ventura, CA 93003-6569
(805) 654-1451  telephone
(805) 654-1453  facsimile
sgalici@EmployeeLawyers.net

THE SPENCER LAW FIRM
Marilynn Mika Spencer (149941)
2727 Camino del Rio South, Suite 140
San Diego, CA 92101
(916) 233-1313  telephone
(619) 296-1313  facsimile
mspencer@spencerlawoffice.com

Attorneys for Plaintiff BARBARA A. PHIPPS

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| BARBARA A. PHIPPS,<br><br>                    Plaintiff,<br><br><br>          *vs*.<br><br><br><br>PATRICK R. DONAHOE, as Postmaster  General, *et al.*,<br><br>                    Defendants, | Case No. 2:07-cv-07-07274-SJO-SH<br>Complaint Filed:    November 05, 2007<br>Judgment Entered:  April 19, 2012<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, TO ALTER OR AMEND JUDGMENT**<br><br>Date:          June 18, 2012<br>Time:          10:00 A.M.<br>Courtroom:  1, Second Floor<br><br>Hon. S. James Otero<br>United States District Judge |

Memorandum in Support of Plaintiff's Motion for New Trial or, in the Alternative, to Alter or Amend the Judgment

## Table of Contents

i.  Introduction .................................................................................................. 1

ii. Factual Summary ......................................................................................... 1

iii. Standards for a New Trial .......................................................................... 2

iv. Legal Argument .......................................................................................... 2

    I.   False testimony of defendant's witness:  Defendant's witness Divina Villegas falsely testified that the Postal Service conducted a job search for plaintiff within a 50-mile radius of the Ojai Post Office.  The falsity of this testimony was discovered after the trial and could not have been discovered before the trial by due diligence ..................................... 2

    II.  Jury misconduct:   The jury foreman introduced extraneous "evidence" that was not presented at trial and was in fact false, which prejudiced the jury.  Specifically, the jury foreman repeatedly insisted as fact that plaintiff received a settlement from a separate disability claim that satisfied all of her damages, despite that there was no evidence whatever supporting this so-called settlement.. ............................... 4

    III.  Verdict against the clear weight of the evidence as to each of plaintiff's three claims ..................................................................................... 8

        A.  On Claim 1 for failure to provide reasonable accommodation: The jury's verdict that plaintiff did not prove by a preponderance of the evidence that she is a qualified individual within the meaning of the Rehabilitation Act is against the clear weight of the evidence because:. ............................................................................... 8

            1.  Plaintiff established by a preponderance of the evidence that she was able to drive her mail delivery vehicle (the LLV) using both hands on the steering wheel, and there is a complete absence of evidence to the contrary ................................................................... 9

i

2. Plaintiff established by overwhelming evidence that she was able to case mail, load the hamper, load the LLV, and deliver the mail on her route within her lifting restriction, and there was no credible evidence to the contrary ....................................................12

3. The collective bargaining agreement does not prohibit modified duty for rural mail carriers injured on the job, contrary to the defendant's assertion, for which the defendant did not produce evidence..........................................................................................16

B. On Claim 2 for retaliation for participation in protected activities: The verdict that plaintiff was not subjected to an adverse employment action in retaliation for engaging in activity protected by the Rehabilitation Act is against the clear weight of the evidence ..17

C. On Claim 3 for interference, coercion, and intimidation for exercising disability rights, the verdict that plaintiff failed to prove by a preponderance of the evidence that there was a causal link between her protected activity and defendant's actions of interference, coercion and intimidation...................................................19

v. Conclusion    ............................................................................................20

ii

Memorandum in Support of Plaintiff's Motion for New Trial or, in the Alternative, to Alter or Amend the Judgment

Table of Authorities

**Federal Cases**

**United States Courts of Appeal**

*Defenders of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000) ........... 3

*King v. Harrington*, 447 F3d 531 (7th Cir. 2006) ...................................... 2

*Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365 (9th Cir. 1987) ................................................... 8

*Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. 2007) ...................... 3, 8

*Sassounian v. Roe*, 230 F.3d. 1097 (9th Cir. 2000) ............................... 5, 7

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F3d 814 (9th Cir. 2001) …………………………………...…………….. 2

*United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993) .................................. 6

*United States v. Halbert*, 712 F.2d 388 (9th Cir. 1983) ........................... 5

*United States v. Langford*, 802 F.2d 1176 (9th Cir. 1986) ....................... 5

*United States v. Madrid*, 842 F.2d 1090 (9th Cir. 1988) .......................... 7

*United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979) ........................... 7

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.* 609 F3d 1308, 1313 (Fed. Cir. 2010) …………………………………………….2

**Federal Statutes**

**Rehabilitation Act**........................................................... 8, 9, 17, 19, 20

29 U.S.C. 791(g)........................................................................ 3

**Americans with Disabilities Act**

    42 U.S.C. 12111(9)(B) ................................................................ 3

**Federal Rules**

    Federal Rule of Civil Procedure 59 ........................................... 2

    Federal Rules of Evidence 606(b)(1) ......................................... 4

    Federal Rules of Evidence 606(b)(2)(A) .................................... 4

**Federal Regulations**

    5 C.F.R. §353.301(d) ................................................................. 3

    29 C.F.R. 1614.203 .................................................................... 3

    29 C.F.R. 1630.2(o)(2)(ii) .......................................................... 3

## i. Introduction

Plaintiff Barbara Phipps brings this motion for a new trial to address the juror misconduct that resulted in her loss at trial. The jury inappropriately considered "evidence" that was never introduced at trial. Moreover, the jurors did not know this "evidence" was in fact false. Additionally, defendant's witness Divina Villegas provided perjured testimony, a fact that was not discovered until after the trial ended. Either one of these reasons provides this court with reason to set aside the verdict and order a new trial. In addition, the verdict on each claim is against the great weight of the evidence. These reasons, considered independently or together, compels such an order.

## ii. Factual Summary

Phipps sued her employer, defendant United States Postal Service, for failure to accommodate her disability of medial and lateral epicondylitis and for retaliation and interference, coercion and intimidation. After a jury trial in November 2011, the jury found in favor of the defendant, as follows:

Claim No. 1 – Failure to Provide Reasonable Accommodation

Question No. 1: "Has plaintiff proved by a preponderance of the evidence that she had a disability within the meaning of the Rehabilitation Act?" The jury checked, "Yes".

Question No. 2: "Has plaintiff proved by a preponderance of the evidence that she was a qualified individual within the meaning of the Rehabilitation Act? In other words, has plaintiff proved by a preponderance of the evidence that she would have been able to perform the essential functions of a rural carrier position with or without a reasonable accommodation? The jury checked, "No". VOL. V, 31:9-32:1

Claim No. 2 – Retaliation for Participation in Protected Activities

Question No. 8: "Has plaintiff proved by a preponderance of the evidence that she engaged in activity that is protected under the Rehabilitation Act?" The jury checked, "Yes".

Question No. 9: "Has plaintiff proved by a preponderance of the evidence that she was subjected to an adverse employment action in retaliation for engaging

in activity protected by under the Rehabilitation Act?" The jury checked, "No". VOL. V, 32:5-17.

Claim No. 3- Interference, Coercion, and Intimidation for Exercising Disability Rights.

Question No. 13-A: "Has plaintiff proved by a preponderance of the evidence that she exercised a right granted or protected by the Rehabilitation Act?" The jury checked, "Yes".

Question No. 14: "Has plaintiff proved by a preponderance of the evidence that defendant engaged in acts to coerce, intimidate, threaten, or interfere with plaintiff's ability to engage in activity that is protected by the Rehabilitation Act?" The jury checked, "Yes".

Question No. 15: "Has plaintiff proved by a preponderance of the evidence that there was a causal link between her protected activity and the defendant's actions?" The jury checked, "No". VOL. V, 32:24-33:18.

## iii. Standards for a New Trial

A court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F3d 814, 819 (9th Cir. 2001); *King v. Harrington*, 447 F3d 531, 534 (7th Cir. 2006) (new trial granted if verdict is against manifest weight of evidence). A court can order a new trial even if substantial evidence supports the jury's verdict. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs, supra*; *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc*., 609 F3d 1308, 1313 (Fed. Cir. 2010). Various types of misconduct by jurors during deliberations are grounds for a new trial under FRCP Rule 59, including consideration of matters not in evidence. *Sassounian v. Roe*, 230 F3d 1097, 1108 (9th Cir. 2000)

## iv. Legal Argument

**I.    False testimony of defendant's witness:  Defendant's witness Divina Villegas falsely testified that the Postal Service conducted a job search for plaintiff within a 50-mile radius of the Ojai Post Office. The falsity of this testimony was discovered after the trial and could not have been discovered before the trial by due diligence.**

Divina Villegas testified as the defendant's Manager of Health and Resource Management (VOL. III, 185:21-23). and also as the chair of the Sierra Costal District Reasonable Accommodation Committee ("DRAC") at the time plaintiff requested reasonable accommodation in 2006. VOL. III, 185:24-186:10. As defendant's key witness, she lied during her testimony. False or perjured evidence is grounds for a new trial. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). When evidence of false testimony is of such magnitude that truthful testimony likely would have changed outcome of case, and the untruthfulness of the testimony is only discovered after trial because even due diligence could not have unearthed the evidence earlier, a new trial is the appropriate remedy. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000).  The same standard applies to a Rule 59(b) motion to amend the judgment. *Id.*

Under oath, Ms. Villegas testified that the DRAC could not find plaintiff another job because the Postal Service has "to follow a certain pecking order.  And we also have to abide by our collective bargaining agreement".  VOL. III, 196:8-14. According to Ms. Villegas, the first step in the pecking order is to find work in the employee's craft, in this case, the rural carrier craft.  If no work is found, the Postal Service looks to other positions at the same post office such as custodian, window clerk, or distribution clerk. "And if we can't find any work in that building, then, we will expand that search outside that building to another building.  And we go through that same process. . . .  If we can't find anything in that building, then, we go through another building until we reach the 50-mile radius."  VOL. III, 196:18-197:10.

Specifically with respect to the plaintiff, Ms. Villegas testified as follows:

> Q.      So, in Ms. Phipps' case did you try to find her work in her craft, not in her craft, in her Ojai Post Office, and not in her Ojai Post Office?
>
> A.      Yes, we did.
>
> Q.      And the Committee was not able to do that given her five-pound lifting restriction and her no driving restriction –
>
> A.      That's –
>
> Q.      – correct"
>
> A.      That's correct.  VOL. III, 197:11-20.

This was false testimony and Ms. Villegas had to know it was false when she testified.

Plaintiff's expert witness, long-time Postal Service employee George E.("Chip") Lukas, swears in his declaration, filed herewith, that when the Postal Service inquires into alternate work for an employee with disabilities, the postmaster of each postal facility or office within the 50-mile radius completes a package of papers called "work identification worksheets."  These worksheets are "signed by the postmaster of each post office stating that a search had been conducted at that post office and there was no available work."  Mr. Lukas further swears "The paperwork from each post office consisted of several pages.  All the paperwork was in a large stack that was at least 2½ to 3 inches, all contained in a large ring binder." (Lukas Decl. ¶¶ 5-6)

Ms. Villegas' testimony cannot be true.  During the discovery period, the plaintiff served the defendant with a request for production of records specifically asking for all DRAC documents related to Ms. Phipps.  However, the defendant did not produce any documents that could be described as the required "work identification worksheets." (Galici Decl. ¶¶ 8-11)

Mr. Lukas worked closely with Ms. Phipps on her efforts to return to work.  He had no knowledge the Postal Service had conducted any search within the 50-mile radius.

II.    **Jury misconduct took place when the jury foreman brought unfounded and improper extraneous prejudicial information to the jury's attention by stating during deliberations that plaintiff must have received a settlement from a separate disability claim that satisfied all of her damages.**

When inquiring into the validity of a verdict, a juror may testify about whether extraneous prejudicial information was improperly brought to the jury's attention. Federal Rules of Evidence (FRE) Rule 606(b)(2)(A). The Rule provides that such testimony is allowed as an exception to the general prohibition in subsection 606(b)(1) against a juror testifying "about any statements made or incident that occurred during the jury's deliberations, the effect of anything on that juror's or another jurors vote, or any juror's mental processes concerning the

4

verdict."  It is proper for jurors may testify about the introduction and consideration of facts not in evidence, though they may not testify about the subjective effect of those "facts" on the particular juror or the deliberative process. *Sassounian v. Roe*, 230 F.3d. 1097, 1108-1109 (9th Cir. 2000) .

In the Phipps trial, the court instructed the jury to consider *only* evidence in this case and to decide the case solely on the evidence received at the trial. Before jury deliberations, the court instructed the jury as follows:

> "In reaching your verdict you may consider only the testimony and exhibits received into evidence. [¶] The evidence you are to consider in deciding what the facts are consists of the testimony of all the sworn witnesses, the exhibits which are received in evidence, and the facts to which the lawyers have agreed to. [¶] In reaching your verdict you may consider only the testimony and exhibits received into evidence. Certain things are not evidence. Andy you may not consider them in deciding what the facts are. I will list them for you. . . VOL. V, 43:9-18; Jury Instruction 25.

During jury deliberation, the jury foreman, Thomas Burkert, purported to have special knowledge based on his background, insisting that plaintiff received a settlement from a separate disability claim and, from it, received full satisfaction for all of her economic and noneconomic damages. This is evidenced by the declarations of *three of the six jurors*: Donald Mikity (¶¶ 5-6), Rochelle Pfluger (¶ 3) and Donald Bandecca (¶ 3).

 Mr. Mikity states, "Mr. Burkert said Ms. Phipps' [labor] union must have helped her. He insisted that she had received money from a separate disability claim and had already been taken care of.  That is why we sent Jury Note Number 2 . . ." (¶ 5) Ms. Pfluger states, "[Jury foreman Mr. Burkert] said [plaintiff] had received a large disability award that was not put into evidence at the trial and that she was taken care of. We considered this possibility although we did not know for sure whether she had." (¶ 3) Mr. Bandecca states that Mr. Burkert said during deliberations that plaintiff "had been fully compensated by a settlement of a separate disability claim." He goes on to state that the answer to Jury Question Number 2 did not "answer the question about a settlement of a

separate disability claim that took care of Ms. Phipps. None of us knew for sure whether Ms. Phipps had received money from a settlement of a separate disability claim." (¶ 3).

The scope and nature of the extraneous information is made clear by these declarations, making an evidentiary hearing unnecessary. The improper statement of facts not in evidence is unambiguous and requires no inference to reach a connection to the plaintiff's entitlement to any damages in this action. *United States v. Halbert*, 712 F.2d 388, 389 (9th Cir. 1983); *United States v. Langford*, 802 F.2d 1176, 1180 (9th Cir. 1986). Moreover, the declarations are sufficient for the court to consider the content of the extraneous information, the seriousness of the alleged misconduct or bias, and the credibility of the sources without the need for an evidentiary hearing. *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993).

The fact of the foreman's introduction of this extraneous, non-extent and highly prejudicial information of a separate settlement is also evidenced by Jury Question Number 2 (DE 161; VOL. V, 4:15-20), sent to the court in during jury deliberations, as follows:

> "Should the loss of wages for the prolonged period (11 months?) and associated effects of, be considered in this case *or was this covered and settled in a separate disability claim case*."

The agreed response given to the jury was:

> "You should consider the total lost wages and benefits, minus the total amount received from worker's compensation." VOL. V, 12:12-21.

The agreed response evidences that counsel and the court did not take cognizance of the fact that the jury was considering extraneous prejudicial information of a prior settlement of a disability claim separate from and other than the workers compensation claim, which settlement and claim do not, in fact, even exist. The response provided to the jury was based on the premise that the jury was inquiring about consideration of worker's compensation benefits in determining plaintiff's damages. After reading the question to counsel, the Court stated with reference to it, as follows:

> "It seems to be making a reference to the worker's comp portion of the case that was referenced by the parties and counsel in the course of the trial. Of course the worker's comp portion is separate and apart

from the litigation here. But there may be some overlap in terms of the other counts that the plaintiff is pursuing here, including the claim of delay, coercion and retaliation. [¶] So, I'm not sure precisely what the jury is looking at in terms of Question Number 2." VOL. V, 4:21-5:4

Counsel for both parties agreed on a response to Jury Question Number 2 only referencing workers compensation as a separate claim, evidencing that counsel was unaware that the jury was considering the existence of a settlement in a separate disability claim. VOL. V, 5:11-19. This is confirmed by the Declarations of Galici (¶ 3), and Spencer (¶ 3-5).

Because the response to the jury's question did not address the a settlement of a separate disability claim, it cannot be said to cure any of the prejudice that resulted from Mr. Burkert bringing to the jury's attention facts not in evidence (or in existence) that plaintiff must have received funds from another settlement from which her damages were fully satisfied.

In "extraneous-information cases," as is the case at bar, the standard is that a new trial be granted if "there is a *reasonable possibility* that the material *could* have affected the verdict" and the burden is placed "on the party *opposing* a new trial to demonstrate the *absence* of prejudice." *United States v. Madrid*, 842 F.2d 1090, 2094 (emphasis added); *United States v. Vasquez*, 597 F.2d 192, 193-194 (9th Cir. 1979) (holding that a file of extrinsic material left in the jury room for hours was prejudicial).

The factors to be considered in determining prejudice are (1) whether the extrinsic information was actually communicated to other jurors, and, if so, by what means; (2) the length of time it was available to the jury; (3) whether it was introduced before the verdict was reached, and, if so, at what point in the deliberations; and (4) any other matters which "may  bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict." *Sassounian, supra,* 230 F.3d at 1109.

Three jurors provide sworn testimony that the jury foreman made a statement that goes to the very heart of plaintiff's entitlement to recovery.  The improperly-introduced "evidence" asserted the plaintiff had no remaining damages because the Postal Service

already paid or settled her disability claims. This was highly prejudicial to plaintiff, Barbara Phipps!

### III.    The verdict is against the clear weight of the evidence as to each of plaintiff's three claims.

There must be a reasonable basis for the jury's verdict. The complete absence of evidence to support the jury's verdict renders denial of a motion for new trial an error as a matter of law. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). The trial judge does not presume that the verdict is correct. "The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." The "trial judge does not sit to approve miscarriages of justice." *Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  . Where the trial judge has a firm conviction that the jury has made a mistake a new trial is required. *Id.,* at 1372. There must be a reasonable basis for the jury's verdict. The complete absence of evidence to support the jury's verdict renders a denial of a motion for new trial an error as a matter of law. *Molski, supra,* 481 F.3d at 729.

In *Molski*, an ADA case, the district court was found to have abused its discretion in denying the motion for new trial of a restaurant patron on a public accommodations claim. Plaintiff contended that defendant failed to identify and remove barriers. The appellate court found that the jury's rejection of this contention was against the clear weight of the evidence. The uncontested testimony included "a 'laundry list' of architectural barriers". In addition, the jury's determination that the patron was not an individual within the meaning of the ADA was inconsistent with the Act. *Molski, supra*, 481 F.3d at 731-732. *Molski*, under its facts, is strong support for plaintiff's motion for new trial or to alter or amend the judgment.

### A.    On Claim 1 for failure to provide reasonable accommodation, the verdict that plaintiff did not prove by a preponderance of the evidence that plaintiff is a qualified individual within the meaning of the Rehabilitation Act is against the clear weight of the evidence.

The Rehabilitation Act provides that an individual is "Qualified" where she is able to perform the functions of her position or any other available position within commuting distance from the Ojai Post Office. Final Jury Instruction No. 6 (DE 150, p. 6) read to the jury, states:

> "The term qualified individual means an individual with a disability, who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. The individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position."

As to reassignment to a position with the commuting distance, Final Jury Instruction No. 11 (DE 150, p. 11) read to the jury, states in pertinent part that under the Rehabilitation Act, an accommodation by the defendant may include, but is not limited to job restructuring or reassignment to a vacant position.

**1.    Plaintiff established by a preponderance of the evidence that she was able to drive her LLV using both hands on the steering wheel and there is a complete absence of evidence to the contrary.**

Mr. Clayton Reed Jensen, plaintiff's supervisor, admitted that Ms. Phipps suffered her left arm injury on July 1, 2006 but testified that on July 7, 2006 she came to work with a doctor's note stating she could not pick up "a certain number" of pounds and could not drive. VOL. III, 105:17-23. He identified the doctor's note to which he was referring as Exhibit 525 *and admitted that nowhere does it say that plaintiff cannot drive*. VOL. III, 116:24-117:5. Yet Mr. Jensen continued to repeatedly state that plaintiff could not drive when he sent her home on July 7. There is no factual foundation whatsoever for Mr. Jensen's testimony that Ms. Phipps could not drive. All of Mr. Jensen's testimony regarding plaintiff's ability to drive should be disregarded.

Mr. Richard Garcia was asked the basis for his statement that Ms. Phipps could not drive, and he testified, "That's just based on what I've heard in the past couple of days, that there was a note that she . . . could only drive with one hand". Asked whether she could drive in July, 2006, he testified, "Before she brought that note, no, she was able to drive." VOL. III, 154:13-21.

9

The evidence is that on a single occasion, January 29, 2007, Dr. Berenji, plaintiff's treating orthopedic specialist, provided a work capacity description, marking a checkbox with no driving with left arm, which is Exhibit 112-22. VOL. II, 88:10-12. Dr. Berenji testified that he meant when he checked that box that Ms. Phipps could not use the hand break with her left hand, but she could with her right hand. VOL. II, 88:13-18, 93:7-94:21. Every medical report and doctor's note Dr. Berenji provided plaintiff after that date did not state that she could not drive with her left arm. After Exhibit 112-23 the next medical evaluation from Dr. Berenji was on March 15, 2007, Exhibit 112-21.

Dr. Michael Randall, the Postal Service doctor on DRAC, knew at the time during which he was working for the Postal Service that it had two types of vehicles for carriers. He did not know which type Ms. Phipps drove. VOL. III, 225:16-23. It was always his understanding that that one of the types had more physical requirements. VOL. III, 225:24-226:3. He is aware that the LLVs have power-assisted steering and power breaks. VOL. III, 226:4-6. When he spoke to Dr. Berenji, he did not describe to him the requirements for driving the vehicle that Ms. Phipps had to drive. VOL. III, 226:7-16.

Dr. Randall testified that does not know whether or not Ms. Phipps is capable of driving based on the equipment she is given to drive, "I was basing that on Dr. Berenji's opinion that she should not drive." VOL. III, 229:7-10. "I believe that opinion was in writing before I spoke to him." VOL. III, 229:15-20. He was referring to a note he wrote on a prescription pad. Dr. Randall admitted he could be mistaken but reiterated that it was Dr. Berenji's opinion she was unable to drive. VOL. III, 229:21-230:6. He is not sure if he knew that Dr. Berenji had changed his opinion about driving after he learned about her vehicle. VOL. III, 230:8-10.

The DRAC meeting took place on March 27, 2007. Exhibit 550; VOL. III, 192:12-20. Plaintiff testified Divina Villegas (formerly Esguerra) told her about a month after her DRAC meeting that she will never be returning to work for the Postal Service because her doctor said she was 100% disabled. VOL. III, 53:17-54:2. This was based on Villegas' conversation with Dr. Randall and his with Dr. Berenji. VOL. III, 54:3-7. There can be no doubt that at the time that Dr. Randall spoke with Dr. Berenji, Dr. Berenji had already eliminated any driving restriction. Dr. Randall did not mention driving to Dr.

10

Berenji and did not know that had corrected his restrictions to eliminate it. The DRAC decision on plaintiff's reasonable accommodation request was made by letter dated May 25, 2007 (Exhibit 550). At that time, there was no medical opinion stating any restriction on plaintiff's driving, yet the Exhibit 550 denial letter states "your treating physician that your restrictions affect your ability to drive with your left arm".

Dr. Randall testified that he was not told by Dr. Berenji that by turning the steering wheel with her left arm Ms. Phipps would aggravate her condition. VOL. III, 228:22-229:4. Dr. Berenji prescribed avoiding excessive frequent movement of the left elbow but Dr. Randall ignored "excessive" as being the same as "frequent" and never discussed his interpretation with Dr. Berenji. VOL. III, 228:6-9; 229:10-18.The uncontroverted facts are that plaintiff has driven for the past several years without aggravation of her epicondylitis.

Mr. Lukas testified that the vehicle that Barbara Phipps drives and all the carriers drive is on the right-hand side. VOL. I, 87:5-8. The only parts of driving the vehicle that involve the left hand other than the steering wheel are the turn signal and the headlight knob. VOL. I, 87:9-19.  Plaintiff testified that the Postal Service vehicle she drives is a LLV, with power steering and power breaks, the driver's seat on the right and you operate it with her right arm. Her buckets are at waist level and, while she is stopped, she reaches for the mail with her right hand, or with her left if she can, and puts it in the mailbox with her right hand. VOL. II, 150:24-151:24. The LLV used by the Postal Service is pictured in Exhibit 551-9.

There is no dispute that plaintiff's disability is permanent, yet plaintiff has been driving her LLV at work since she was allowed to return to work in June, 2007. Dr. Berenji's expressed reason for checking the box for no driving on Exhibit 112-22 that he was referring to operating the hand break, not the steering wheel, is uncontroverted. Because the LLV has the hand break on the right, the restriction was entirely inapplicable to plaintiff's driving. There is a complete absence of evidence that Ms. Phipps was unable to drive with both hands on the steering wheel or that any of her restrictions adversely affect her ability to drive.

**2.     Plaintiff established by overwhelming evidence that she was able to case mail, load the hamper, load the LLV, and deliver the mail on her route within her lifting restriction.**

Mr. Lukas testified to how plaintiff could perform the essential functions of her rural mail carrier position with very modest reasonable accommodation. He had discussed with Postmaster Tuitama about ways to modify the job so that Barbara could do it within her medical restrictions. She could just handle smaller bundles. It would not slow her down to do so or any additional cost. VOL. I, 114:20-115:14. Plaintiff testified the same. VOL. III, 29:1-25. She limited use of her right side at home because she relies on using it at work. VOL. III, 33:2-18. Mr. Tuitama said filling the buckets half full was satisfactory to him and was a part of the plan he and Lukas and Barbara had worked out. VOL. II, 223:13-224:3.

Mr. Lukas testified that in the beginning of the day, Ms. Phipps could just reach up and grab a bundle of letters from the tray because there was no need to lift the entire tray, which is brought to carriers' workstations by the clerks. "So she did not have to walk around the office holding mail." VOL. I, 115:16-21. She could have done her entire route two weeks after her injury with some modification. VOL. I, 117:7-11.

In addition, Mr. Lukas testified to other jobs in the office Ms. Phipps could have done, including express mail delivery runs, answering the phone, doing edit bookwork or red bookwork, which are rosters of deliveries for each route, which would probably amount to about four hours of work a day. VOL. I, 116:3-15.

Plaintiff testified that for the eleven months she was off work, she went into the Ojai Post Office either every day or at least two times a week asking when she was going to get to come back to work. "I showed them how I could still do my route without, you know, little help from anyone else." VOL. III, 28:17-22.

Jensen testified that he has seen rural carriers pull down into half-buckets and assigned duties such as answering the phone. VOL. III, 114:7-14 He admitted that rural carriers receive help from others case the mail and deliver the mail and help with lifting heavy parcels. If any carrier needs help, others will jump in and help. VOL. III, 116:6-23. He said he did not recognize her Exhibit 525 doctor's note plaintiff brought to him on

July 7, 2006 as a request for reasonable accommodation, and if he had, he would have sent it to the District. VOL. III, 117:9-16. He never reviewed any information regarding the volume of mail on plaintiff's route before advising DRAC of her work requirements. VOL. III, 118:3-119:13.

Postmaster Garcia testified that because the Ojai Post office is so small that supervisors and the postmaster help with sorting the mail and supervisors are required by the union contract to break out so much mail". VOL. III, 131:14-132-24. He admitted to having helped Ms. Phipps case mail before her injury. VOL. III, 132:6-11.

Mr. Lukas testified that Mr. Tuitama was in contact with the District trying to find a way to get her back to work. Mr. Tuitama said he needed permission from the District. VOL. I, 113:9-22; VOL. II, 05:24-206:7. This was true even with respect to work that had to be done that was not getting done. VOL. II, 205:8-12; 115:22-25.

Postmaster Tuitama remembers that he spoke someone in the District office, maybe Ms. Montenegro, and was told it was a workman's comp case and there was nothing he could do. VOL. II, 174:17-175:1. That was when the CA-2 was filed. VOL. II, 175:2-5.

He "sent up" Exhibit 9 and all medical notes Ms. Phipps gave to him. VOL. II, 176:3-177:2. It was sent to June Montenegro. She told him that any reasonable accommodation request had to be approved by her manager, Divina Villegas.VOL. II, 177:7-22. He called talking to Ms. Montenegro on several occasions and was told it was a worker's compensation issue, yet at that time, there was no approved claim.VOL. II, 177:25-178:15; 178:16-179:8.

Ms. Montenegro testified she never made a determination that Phipps was not entitled to return to work. VOL. III, 177:10-12. She was not aware that Ms. Phipps was not allowed to return to work after she brought in to the Ojai Post Office a doctor's note and had nothing to do with that. VOL. III, 177:13-19. She acknowledged that an employee is entitled to reasonable accommodation if hurt on the job but a worker's compensation claim was not yet accepted. VOL. III, 169:20-24.

Postmaster Tuitama testified that he had discussed Ms. Phipps' request for reasonable accommodation with Divina Villegas, [Manager of Health and Resource

13

Management and DRAC Chairman (VOL. III, 185:21-186:10)]. He said it was her decision to advise him on what to do. So, he would call her and give her the information she requested. VOL. II, 173:25-174:7.

Ms. Villegas testified that a rural carrier is absolutely eligible for reasonable accommodation at the Post Office. VOL. III, 201:5-7. *She testified that the postmaster has authority to provide office work for Ms. Phipps without District authorization.* Asked, "Is there any reason why Ms. Phipps could not have done work answering the phones, handling red book entries, doing special deliveries if the postmaster wanted to put her to work in those position that needed to be done?" She testified, "I would not be able to answer that question on behalf of the postmaster, no." VOL. III, 206:21-207:1.

While testifying that the postmaster could give such work to an injured employee, she said she could not because it was "make work". VOL. III, 207:2-5. Asked whether make work means that you create a job, she replied that it takes work away from others but did not know of anyone who would have been deprived of work by giving it to plaintiff. VOL. III, 207:9-17.

The reason Tuitama nominated Barbara for consideration by DRAC was because "I felt that in her circumstances . . . there's going to be somewhere where she can . . . be gainfully employed . . . in the Postal Service." VOL. II, 205:14-20. It is clear from all the evidence that Jensen, Montenegro and Villegas were protecting Garcia because it took him at least a year for his Clovis promotion to be completed.

Plaintiff's lifting restriction for her left arm was initially five pounds and was increased to ten pounds. The restriction did not prevent her from performing her essential duties of sorting, loading and delivering the mail as defined by Ms. Villegas. VOL. III, 193:13-17. Ms. Phipps testified that since she came back to work the Postal Service has not given her any reasonable accommodation. "I can pretty much do my whole route without any help. The packages that I get on my route are very light weight. And I have a small route. So, I don't really get that much." VOL. III, 48:7-20. Delivery takes her about two hours. VOL. III, 48:21-23.

She testified that Mr. Jensen also told her she was not to have accommodation and that she had to come back 100% and would have to be able to lift 70 pounds. She has

never seen a rule requiring her to lift 70 pounds. VOL. II, 254:22-255:10. Neither has Mr. Lukas.

Mr. Lukas, a very credible and authoritative witness, testified that the 70-pound requirement in Exhibit 7, under "Description of Work" is not an essential function of a rural carrier. Mr. Lukas could not remember ever having seen a package weighing 70 pounds. VOL. I, 82:2-22. The reason that 70 pounds is stated in the Description of Work is because it is the maximum weight a customer can mail. VOL. I, 82:25-83:1 The Postal Service has no policy that requires a rural carrier to lift 70 pounds. Bulky is the most important thing, not weight. If it is a bulky parcel, carriers in Ojai always ask for help. VOL. I, 83:2-15.

Mr. Lukas said he only knows of one carrier who gets 70-pound parcels, and she works in the Chino Post Office. It is a business pick up from a barbell and dumbbell company and the business loads the dumbbells into her truck and when she returns to the post office, a *couple of clerks* put them on a hand truck and take them onto the dock to be shipped. The carrier never even touches them; she refuses to do so because they are too heavy. "Now, she is a 63-year-old lady about to retire. And there's no way that she could handle a 70-pound parcel." VOL. I, 83:16-84:8, Helping and asking for help from other carriers are encouraged and there is a safety manual that "tells us if we need help, just ask for help." VOL. I, 84:16-23.

As to the five-pound lifting restriction, Villegas testified that Ms. Phipps requested at the meeting that she have another employee either load her vehicle or pick up any mail that is over her weight limitation. VOL. III, 195:11-15. The Committee did not consider this a reasonable request "because that would mean having to create another position" and have a new employee just assigned to plaintiff. VOL. III, 195:16-23.

Ms. Villegas statement is flatly contradicted by every witness who testified about whether it was a part of the job to ask for help at the Ojai Post Office. Mr. Lukas was not permitted to attend the DRAC meeting and he testified that Ms. Phipps did not need someone to load her truck by keeping the buckets half full and lifting with her right arm. VOL. I, 118:18-119:3.

15

Finally, and most significantly, it is undisputed in the evidence at trial that although plaintiff was permitted by doctors to return to work without restrictions or request for reasonable accommodation, she has a permanent disability that requires her to limit the use of her left arm and lift with her right and Ms. Phipps has been performing her job since being allowed to return to work in June, 2007 and she has delivering the mail on her route. It is against the clear weight of the overwhelming evidence that plaintiff is unable to perform her job with her epicondylitis disability.

### 3. The Collective Bargaining Agreement Does Not Prohibit Modified Duty for Rural Mail Carriers Injured on the Job.

Mr. Lukas testified that the meaning of the MOU provision stating rural routes are not eligible for light duty is to prohibit Postal Employees in other crafts from obtaining light duty assignments on rural routes. VOL. I, 120:19-121:7.

Yet, Postmaster Tuitama testified that he was told by June Montenegro, Divina Villegas or someone else at injury compensation that the union contract states that rural carriers are not eligible for reasonable accommodation. VOL. II, 212:17-213:14. Mr. Jensen said that under the terms of the union contract, rural carriers are not eligible for light duty. VOL. III, 106:10-18. Postmaster Garcia testified the same. VOL. III, 138:1-2. June Montenegro testified that she is that rural carriers under their collective bargaining agreement are not eligible for light duty – meaning having been hurt off the job. VOL. III,169:13-19. She testified that an injured rural carrier can ask for reasonable accommodation. VOL. III, 169:25-170:2. And go before DRAC, the "group of experts". VOL. III, 170:3-6. This is her understanding of what happened with respect to Barbara. VOL. III, 170:7-9. It appears to her that the way it works is that the only way to get reasonable accommodation at the Postal Service is to ask for a nomination to the Reasonable Accommodation Committee. VOL. 171:6-9.

It is clear and unmistakable that that Exhibit 18 (VOL. I, 120:8-11), the MOU stating that rural routes are not eligible for light duty assignments, is irrelevant because plaintiff was injured on the job, as the court ruled during the trial. VOL. III, 144:18-145:4.

16

**B.      On Claim 2 for retaliation for participation in protected activities, the verdict that plaintiff was not subjected to an adverse employment action in retaliation for engaging in activity protected by the Rehabilitation Act is against the clear weight of the evidence**

The jury found that plaintiff had established by a preponderance of the evidence that she had been subjected to interference, coercion and intimidation for exercising her right to request reasonable accommodation. Interference, coercion and intimidation are forms of retaliation by definition (*i.e.*, for having engaged in protected activity).

On July 7, 2006, Mr. Jensen failed to recognize plaintiff's request for reasonable accommodation. He violated policy by failing to notify the District of the injury and took it upon himself to deny plaintiff employment.

Postmaster Garcia acknowledged that he has been trained twice a year on what to do when an employee reports to him a workplace injury. VOL. III, 133:21-134:1. He that he was the Postmaster at the Ojai Post Office at the time of her injury on July 1, 2006. VOL. III, 132:18-23. He left sometime during the month of July, 2006. VOL. III, 150:10-16. After her injury and before he left the Ojai Post Office, *Mr. Garcia testified he did not send Ms. Phipps to a doctor, he never sought a CA-16 to authorize medical care for her, he never notified the District of her injury, and he never gave her a worker's compensation claim form, either a CA-1 or CA-2.* VOL. III, 150:21-151:7. Mr. Garcia discriminated against her for her disability and retaliated against her by the foregoing as well as by "losing" her written statement of her injury when she refused to post-date her injury date. VOL. III, 152:14-16; 14:25-15:19. Postmaster Tuitama testified that Mr. Garcia told him that Ms. Phipps had completed a written statement of how her injury occurred. VOL. II, 199:14-21.

Mr. Garcia admitted transferring to Clovis and getting a promotion a year or two later, where he is currently the postmaster. VOL. III, 151:8-12; 126:15-17. It can take up to four years to get a promotion. VOL. III, 151:13-15. Plaintiff testified that on July 6, 2006, he had left the Ojai Post Office during the day because he was preparing to move his family to Clovis and transfer. VOL. III, 13:25-14:1.

17

Postmaster Tuitama testified that Mr. Garcia transferred to West Clovis from Ojai in July, 2006, where he receives higher pay than he did in Ojai. VOL. II, 32:25-33:13. It took about a year. VOL. II, 33:14-18. He testified that postmasters' pay depends on the "level" of the city, meaning how big it is and the total number of deliveries. VOL. II, 32:3-24. Postmaster Garcia testified that at Clovis, there are 68 carriers, 31 rural and 32 city routes and 5 contract rural route positions. VOL. III, 126:20-22. The Ojai Post Office has 6 city routes and nine 9 routes, for a total of fifteen routes. It's a small office. VOL. III, 130:2-22. The highest number of employees reached in Ojai was 30, not counting substitute carriers who would work one day a week. VOL. III, 131:9-13.Postmaster Tuitama made clear that the Postal Service has a "pay for performance" method of paying postmasters and supervisors and they are evaluated on an annual basis. The evaluation includes consideration of the number of employee on-the-job injuries. VOL. II, 22:11-23:24.

The clear weight of the evidence is that Postmaster Garcia retaliated against plaintiff for her efforts to notify the Postal Service of her injury and obtain reasonable accommodation and continue to work. He acknowledged that getting the paperwork wrong can delay the process of an injured employee getting "paid and getting them taken care of." VOL. III, 135:17-24.

At the late-July, 2006  a meeting between plaintiff, Postmaster Tuitama, Mr. Jensen and Mr. Lukas, Mr. Jensen recommended the wrong worker's compensation claim form, a CA-2 for an occupational disease, rather than a CA-1 for a traumatic injury.  He had completed many such forms since 1996, when he became a supervisor. VOL. III, 119:17-23; 98:2-11. His insistence that plaintiff must file a CA-2 comports with Postmaster Garcia's attempt to excuse his abject failure to complete and send a worker's compensation claim form on the disingenuous theory that the injury occurred over time, when the completely clear weight of the evidence is that it did not.

June Montenegro followed suit by doing nothing to assist plaintiff in obtaining medical information and Divina Villegas and DRAC considered restrictions that plaintiff did not even have in denying her request for reasonable accommodation, after excluding Mr. Lukas from the DRAC meeting. While Mr. Tuitama was doing everything he could

to get the Postal Service to return Ms. Phipps to work, Ms. Villegas did not approve any type of available work for plaintiff. The clear weight of the evidence is that placing plaintiff on unpaid leave and keeping her on leave for 11months was an adverse action that was in retaliation for plaintiff's request for reasonable accommodation.

**C.    On Claim 3 for interference, coercion, and intimidation for exercising disability rights, the verdict that plaintiff failed to prove by a preponderance of the evidence that there was a causal link between her protected activity and defendant's actions of interference, coercion and intimidation.**

As is true with respect to the jury verdict on the adverse action for retaliation, the verdict not finding causation but finding interference, coercion and intimidation signals that the jury was mistaken. There can be no interference with plaintiff's working if defendant did nothing wrong by keeping plaintiff on unpaid leave. Finding that it was interference is a finding of wrongdoing, as is a finding of coercion and/or intimidation. If there was wrongdoing, what made it wrong if not the assertion of plaintiff's right to work with reasonable accommodation? The clear weight of the evidence is that the wrong was not limited to delaying her worker's compensation claim, making he use all of her sick and annual leave and not reinstating it until more than 3 years after she returned to work, knowing she had to take several leaves for surgeries for a life-threatening condition. DRAC acted more like an intimidation committee rather than a reasonable accommodation committee. The discriminatory motive need not be the sole cause but only a motivating factor. See, Jury Instruction No. 9 (DE 150, p. 9).

It is clear that the jury was having trouble with understanding the elements of the claim for interference, coercion and intimidation with respect to driving from their Question 13 of the special verdict forms, which states: "Has the plaintiff proved by a preponderance of the evidence that she exercised or enjoyed a right granted or protected by the Rehabilitation Act, or that she was prevented exercising or enjoying from such rights under the Rehabilitation Act." VOL. V, 6:5-13. Jury Question No. 3 asked, "Please expand and clarify this question." It question appears to also state, "It sounds like two questions in one" VOL. V., 5:5-10. Counsel agreed to modify the question as follows: "Has plaintiff proved by a preponderance of the evidence that she exercised and/or

enjoyed a right granted and/or protected by the Rehabilitation Act and/or that she was prevented from exercising and/or enjoying from such rights under the Rehabilitation Act." VOL. V, 14:15:9. The court asked the jury if this helps, and the foreman responded, "No, your honor, I don't think it does. I still believe it would be two questions. You know, you could have a yes or no answer to the first question up to the Rehabilitation Act. And then that second part would almost contradicted – would almost contradict the first answer." The Court replied, "Why don't you return to the jury room. See if you can come up with – the issue that everyone agrees is the issue that needs to be responded to by counsel." VOL.V. 15:10-19.

The jury did not submit another jury question on Question 13 of Special Verdict Form. But counsel agreed on a further change to Question 13 to two questions. Question 13-A was, "Has plaintiff proved by a preponderance of the evidence that she exercised a right granted or protected by the Rehabilitation Act? " Question 13-B was, "Has plaintiff proved by a preponderance of the evidence that the defendant prevented her from exercising or enjoying such rights under the Rehabilitation Act."VOL. V, 18:22-19:23; 21:18-22:19:22. The Court asked the jury if there was anything further, and the foreman responded there was not and "That will do it for us." VOL. V. 23:1-3.

**iv. Conclusion**

For the reasons set forth above, a new trial should be ordered and the judgment be set aside.


Dated:  May 16, 2012            LAW OFFICES OF SAMUEL F. GALICI

                               _____/s/_____
                               Samuel F. Galici

Dated:  May 16, 2012            The Spencer Law Firm

                               _____/s/_____
                               Marilynn Mika Spencer

                               **Attorneys for  Plaintiff  Barbara A. Phipps**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28